IN THE SUPREME COURT OF THE STATE OF MONTANA

IN RE: AMENDMENTS TO )
THE MONTANA RULES OF ) O R D E R
APPELLATE PROCEDURE )

On June 28, 2000, the Montana Supreme Court adopted certain emergency internal operating procedures and modifications to the Montana Rules of Appellate Procedure (M.R.App.P.). Our order of that date, captioned *In the Matter of the Adoption of Emergency Internal Operating Procedures and Appellate Practice Rules*, set forth the reasons the changes were necessary.

Those temporary modifications to the M.R.App.P. have now been in effect for a substantial period of time. They have caused no discernible hardship on litigants or their counsel and, indeed, the modifications have helped this Court to address the concerns expressed in our June 28, 2000, order. For those reasons, we have concluded that the administration of justice in Montana will be best served by officially amending Rules 21, 22, 23(g), and 27(d)(i) and (ii), M.R.App.P., to reflect last year's emergency modifications to those Rules.

Therefore, pursuant to the authority granted this Court by Article VII, Section 2(3) of the Montana Constitution,

IT IS ORDERED that the attached amendments to Rules 21, 22, 23(g), and 27(d)(i) and (ii) of the Montana Rules of Appellate Procedure are hereby adopted, effective immediately.

IT IS FURTHER ORDERED that the Clerk of this Court shall prepare and mail copies of this Order and the amendments to:

The Code Commissioner and Director of Legal Services for the State of Montana;

The District Judges of the State of Montana;

1

The Clerks of the District Courts of the State of Montana;

The Clerk of the United States District Court of the State of Montana;

The Chairman of the Advisory Commission on Rules of Civil and Appellate Procedure;

The President and Executive Director of the State Bar of Montana with the request that this Order be published in the next available issue of *The Montana Lawyer*; and that the Order and the amendments be posted to the State Bar's website;

To the Director of the State Law Library with the request that this Order and the amendments be posted to the Law Library's website; and

To West Publishing Company and to the State Reporter Publishing Company with the request that this Order be published in the *Montana Reports*.

DATED this 24th day of July, 2001.

_____
Chief Justice

_____

_____

_____

_____

_____

_____
Justice

2

**Rule 21. Computation and extensions of time.**

(a) Computation of time. In computing any period of time prescribed by these rules, by an order of court, or by any applicable statute, the day of the act, event, or default from which the designated period of time begins to run shall not be included. The last day of the period shall be included, unless it is a Saturday, Sunday or a legal holiday. When the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays and legal holidays shall be excluded in the computation.

(b) Extensions of time. ~~Generally.~~ Except as provided in subsections (c) and (d) of this rule, ~~relating to appeals in termination of parental rights and abused, dependent and neglected children cases,~~ the court for good cause shown may upon motion extend the time prescribed by these rules or by its order for doing any act, and may thereby permit an act to be done after the expiration of such time if the failure to act was excusable under the circumstances; except the court in a civil case may not extend the time for filing a notice of appeal, except as provided in Rule 5. Within the text of each motion requesting an extension of time submitted to the court for its consideration, counsel shall note that opposing counsel has been contacted concerning the motion and whether opposing counsel objects to the motion. All motions and orders for extension of time shall include a date certain on or before which date the act for which an extension of time is requested must be performed.

(c) Extensions of time—Filing briefs ~~I~~in appeals of termination of parental rights and abused, ~~dependent~~ and neglected children cases. ~~t~~There shall be a presumption against granting motions for extension of time to file briefs. Any motion for extension of time to file a brief in the referenced cases may be granted only upon written motion supported by a showing of diligence and substantial need. Such a motion shall be filed at least 7 days before the expiration of the time prescribed for filing the brief, and shall be accompanied by an affidavit stating:

(1) when the brief is due;

(2) when the brief was first due;

3

(3) the length of the requested extension;

(4) the reason an extension is necessary;

(5) movant's explanation establishing that movant has exercised diligence and has substantial need for the extension, and that the brief will be filed within the time requested; and

(6) whether any other party separately represented objects to the request.
A conclusory statement as to the press of business will not constitute a showing of diligence and substantial need.

(d)  Extensions of time–Filing briefs in other cases.  In all cases except those addressed in subsection (c) of this rule, a party may move for, and, without objection, be granted one 30-day extension of time in which to file a brief required or allowed to be filed under these rules.  Any second or subsequent motion for extension of time to file a brief shall meet the requirements of subsection (c) of these rules.

(de) Additional time after service by mail. Whenever a party is required or permitted to do any act within a prescribed period after service of a paper upon such party and the paper is served by mail, 3 days shall be added to the prescribed period.


**Rule 22. Motions.**

Unless another form is prescribed by these rules, an application for an order or other relief shall be made by filing a motion in writing for such order or relief. The motion shall state with particularity the grounds therefor and shall set forth the order or relief sought. Counsel shall also note therein that opposing counsel has been contacted concerning the motion and whether opposing counsel objects to the motion. If a motion is supported by briefs, affidavits or other papers, whether required by these rules or otherwise, or submitted in a party's discretion, they shall be served and filed with the motion. The supreme court may authorize disposition of motions for procedural orders by a single judge. If a motion seeks dismissal of the appeal or other substantial relief, any party may file an answer in opposition

4

within 7 days after service of the motion, or within such time as the court may direct. A motion to dismiss made by an appellant in a civil or criminal case, except for an Anders motion pursuant to § 46-8-103(2), MCA, must be signed by the appellant personally, as well as by appellant's counsel. Motions, supporting papers and any response thereto may be typewritten.

At the time of filing a procedural motion counsel shall present a proposed order, together with sufficient copies for service upon all counsel of record, as well as stamped envelopes addressed to all counsel of record.

**Rule 23. Briefs.**

. . . .

(g) ~~Length of~~ Overlength and supplemental briefs and costs.

(i) Motions to file overlength and supplemental briefs will not be routinely granted except in capital cases. Motions to file such briefs in other cases must be supported by an affidavit demonstrating extraordinary justification.

(ii) ~~Except by permission of the court, briefs may not exceed the limits specified in Rule 27(d).~~ For purposes of assessing costs in civil cases under section 25-10-104, Montana Code Annotated, reasonable costs shall be determined as follows: Costs will be allowed for the actual cost per page for up to 9 copies of each brief plus 2 copies for each party to be served, unless the court shall direct a greater number of briefs to be filed. In taxing costs for printing or photographing documents, the clerk shall tax costs at a rate not to exceed .20 cents per page or at actual cost, whichever shall be less. If a cross appeal is filed, the appellant will bear the original costs of the transcript.

. . . .

**Rule 27. Form of briefs and other papers – duplication.**

. . . .

5

(d) Calculations and length.

(i) Proportionately spaced briefs. A principal brief ~~must~~ shall not exceed ~~14,000~~ 10,000 words and a reply brief, amicus brief or petition for rehearing must not exceed ~~7,000~~ 5,000 words. No brief or petition may have an average of more than 280 words per page, including footnotes and quotations.

(ii) Monotype or typewritten briefs or petitions. ~~Briefs~~ A principal brief prepared in a monospaced typeface shall ~~either~~ not exceed ~~40~~ 30 pages ~~for a principal brief~~ and ~~20 pages for~~ a reply brief, amicus brief, or petition for rehearing ~~or motion; or conform to the format and word count noted at (i) above.~~ shall not exceed 14 pages. Petitions filed under Rule 17(b) shall not exceed 5,000 words or 14 pages.

Justice Terry N. Trieweiler dissenting.

I concur with those parts of this Court's Order which retain the temporary modifications made to Rules 22 (motions), 23(g) (motions for over length briefs), and 27(d)(i)(ii) (length of briefs), to the Montana Rules of Appellate Procedure.

I dissent from this Court's permanent adoption of the temporary modification to Rule 21 regarding extensions of time. I believe it is unrealistic, unnecessarily burdensome and typical of this Court's increasing tendency to assume that bureaucratic rules will make the Court's job easier. As another example, see Rule 54, M.R.App.P., regarding mandatory mediation and this Court's recent decision in *Dobrocke v. City of Columbia Falls*, 2000 MT 179, 57 St. Rep. 718, where the majority held that failure to comply with the requirement for appellate mediation will result in dismissal of an appeal.

Former Rule 21 was simpler, clearer and more appropriate to the realities of every day law practice. It provided that extensions of time could be granted based on a demonstration of good cause and it relied primarily upon whether the opposing party felt he or she was inconvenienced by the extension. Good cause was frequently demonstrated by the "press of other business" which is now an inadequate reason for the majority but is one of the harsh realities of every day life to the average litigator.

Furthermore, I can see absolutely no connection between today's revisions to Rule 21 and the purpose for which we adopted emergency revisions to the rules in June 2000. Those rules were purportedly adopted to help with this Court's increasing work load during a time when we were understaffed following the removal of two justices from our normal rotation in anticipation of their retirement. Making it more difficult for attorneys to get needed extensions does nothing to lessen this Court's workload. In fact, it does just the opposite. It creates a whole new function for someone at this Court to perform because the applications for extensions now require closer scrutiny and occasional consideration by the entire Court.

I am told, however, at our conference where these matters are discussed, that it is important for people to submit their briefs in a timely fashion so this Court can consider the merits of appeals in a timely fashion. That argument might have some merit under other circumstances, but seems disingenuous in light of this Court's simultaneous amendment to our internal operating rules on June 28, 2000, which prohibits the Clerk of Court from sending us anymore than seven new cases a week for consideration. As a result, we had as of June 20, 2001, a backlog of 52 cases sitting in the Clerk of Court's office waiting to be sent to us at the rate of seven cases per week. At that rate, and based on the number of appeals we expect to be filed this year, the backlog by the end of this year will be just under four months. That means that from the time all briefing is completed by both parties, a case can expect to sit and gather dust in the Clerk of Court's office for two months before even being delivered to the members of this Court for their consideration and vote. It appears then that the theory of maintaining the revisions to Rule 21 is that litigants should hurry up and wait.

My strongest objection to the majority's order, however, is the action taken concurrent with the order but not specified in the order. At the same time the Court voted to make permanent the changes to appellate procedure, it also voted to retain the change made to Section I, Montana Supreme Court 1996 Internal Operating Rules which prohibits the Clerk of Court from sending this Court more than seven cases per week. I originally supported that temporary modification in an effort to deal with the unique situation in which the Court found itself in mid-2000. As noted in the Emergency Order, Chief Justice Jean A. Turnage and Justice William E. Hunt would no longer be participating in classification panels as of August 1, 2000, and it was necessary to complete all cases in which they had participated by December 31, 2000. However, that is no longer the situation. This Court is at full strength. The average age is 20 years younger than when I joined the court in 1990 and there is no reason that this Court cannot handle more than seven new cases a week. (It must be kept in

mind that all cases are assigned to a five-person panel so that in reality each justice is now reading only four to five new cases per week.)

Arbitrarily limiting the number of new cases that this Court will consider per week is nothing short of a work stoppage. It is a simple refusal of this Court to decide appeals as they arrive. It is an historic first and unworthy of a court of this caliber. Work stoppages are for labor unions - not supreme courts.

People sought this job by appointment or election. If after arrival it turns out that the work is too much, there are other options. However, refusing to do the work is not one of them.

What is worse is that the majority has no plan for dealing with this increasing backlog in the future. Last week the backlog was 52 cases. By the end of the year the backlog could be over 100 cases. By the next time the Legislature meets, the backlog could be over 200 cases or a nearly eight month delay from the time an appeal is fully submitted until the Court will even consider it.

I expect that the purpose of this arbitrary refusal to accept cases as they are presented is to bring public attention to this Court's workload. The majority of the Court's members are disappointed with the fact that the Legislature did not enact an intermediate appellate court and feel that a substantial backlog of work will re-focus attention on the need for one.

However, the majority's frustrations are misdirected. An intermediate appellate court will not be passed or defeated based on perceptions among the legal profession. Creation of an intermediate appellate court depends on views at the Montana Legislature. Based on my observations of the last legislative session, there is no misunderstanding there about the need for an intermediate appellate court. The bill which had broad support when introduced simply failed because it was commandeered by the majority party's amendments which made it little more than a partisan agency rather than an independently functioning judicial body. To the extent that this Court and its chief justice and chief lobbyist tacitly approved those

9

amendments, this Court can accept responsibility for failure of the intermediate appellate court.

Seven new cases a week (or in reality, the four or five that we actually participate in) together with the reduced length of briefs is frankly not that much work and is substantially less than this Court has done in the previous ten and a half years that I have been here. Furthermore, the last session of the Legislature authorized three new clerkship positions to assist with the Court's workload. Maybe we should give them back. I doubt they would have been authorized had the Legislature known that, in fact, the Court planned a work stoppage.

Still unanswered are whether the Court intends to suspend operations indefinitely and, if we don't start now, when will the backlog be addressed? The majority has no plan other than to make its political point.

The majority's refusal to increase the number of new cases we consider each week until we resolve this Court's growing backlog is peevish and misguided. Therefore, I dissent from the majority's decisions to make it more difficult for parties to get extensions of time within which to file their briefs and at the same time refuse to read those briefs once they arrive.

DATED this 24th day of July, 2001.

_____
Justice

Justice James C. Nelson concurs.

I concur with the rule amendments that we have made. My perception of the necessity for making these changes may be different than those of other members of the Court, but, speaking for myself, I am satisfied that we are not punishing practicing attorneys, prejudicing litigants, or shirking our judicial responsibilities in adopting these amendments.

At the outset, I believe that it is appropriate to put this matter in the context of certain background facts:

As our Order points out, we adopted essentially these same rule changes on an emergency basis on June 28, 2000. We did so for five reasons: (1) to address the impact on Montanans' Article II, Section 16 constitutional rights of meaningful access to the courts incident to delays in the appellate process at both the briefing and opinion-writing stage; (2) to better manage our increasing workload to the end that quality is not sacrificed for quantity; (3) to maintain the current Court's philosophy of trying to hear more cases on oral argument, despite our increasing workload; (4) to deal with the impact on our internal operations occasioned by the retirements of then Chief Justice Jean A. Turnage and Justice William E. Hunt; and (5) to implement, to the extent feasible, the October 27, 1998 Final Recommendations of the Intermediate Appellate Court Study Committee (Study Committee) and the September 15, 1998 report prepared by Roger A. Hanson, of the National Center for State Courts, for the Study Committee (Hanson Report). These recommendations and this report acknowledged that this Court was approaching a maximum productivity level and that

11

we needed to study various procedural changes including expedited calendars, staffing, and the use of memoranda opinions. *See In The Matter of The Adoption of Emergency Internal Operating Procedures and Appellate Practice Rules* (June 28, 2000), 57 St. Rep. 701.

Since June 28, 2000, only one of the reasons necessitating our adopting the emergency order has been rendered moot. Chief Justice Turnage and Justice Hunt have retired, and the Court is now back to full strength by reason of the election of Justice Patricia O. Cotter and the appointment of Justice James A. Rice. The first, second, third and fifth reasons for the emergency rules remain as valid now as they were over a year ago. In fact, our workload-- the driving force behind our appointment of the blue-ribbon Study Committee; our commissioning of the Hanson Report; our request in the past two legislative sessions that an intermediate appellate court be created; and our adoption of the subject rule revisions, both on an emergency and permanent basis--has continued to increase. At present, new filings are well over 20 percent greater than they were in 1998 (when the Study Committee and Mr. Hanson conceded that this Court was "approaching a maximum productivity level"). New filings in 2001 even exceed the number of new filings in the year 2000--itself a record year with new filings that year approximating 23 percent more than new filings in the previous year, 1999.

The point is that the problems and challenges that necessitated the rule amendments in the first place have not been resolved despite our best efforts. Indeed, for reasons beyond our control, the problems have only gotten worse.

Accordingly, in my view at least, if the members of this Court are going to avoid becoming little more that glorified paper shufflers, then it is incumbent that we manage our workload and internal operating procedures as aggressively as possible. We were charged to do precisely that by the Study Committee three years ago and we have been subject to criticism by members of the Bar and by the Legislature for failing to follow the recommendations of the Study Committee. These changes should, thus, come as no particular surprise to anyone. They have been urged upon us from all fronts.

As for the rule changes themselves, Rule 21, M.R.App.P., has been amended to require that, except in termination of parental rights and dependent and neglect cases, extensions of time to file briefs beyond the first unopposed 30-day extension, be justified by the attorney or party seeking the extension. The Hanson Report concluded that, especially in criminal appeals, substantial delays in the appellate process are being occasioned by litigants failing to timely file briefs. Accordingly, since briefing delays were identified as one of the sources of appellate delay, it is appropriate that we address it.

That said, in my eight-plus years as a member of this Court, I am not aware of the denial of any good faith, legitimate motion for extension of time to file a brief--opposed or not. Even since we adopted our June 28, 2000 emergency order that, to my knowledge, has remained the case. I do know for a fact and from personal experience, however, that, at least until our June 28, 2000 order, in many cases seriatim motions for extension of time were cavalierly requested by certain practitioners and were just as routinely granted by this Court.

This practice made a mockery of the filing times specified by the rules, delayed the resolution of appeals to the detriment of opposing parties, and, in some cases, resulted in appeals simply falling through the cracks by reason of procrastination on the part of counsel.

To the extent that attorneys now have to give some thought to requesting a second or subsequent extension of time to file a brief and have to justify the request by showing good cause, I believe that, ultimately, appeals will be more expeditiously resolved.

With regard to the Rule 23 and Rule 27 amendments pertaining to the length of briefs, again I believe that this is a legitimate exercise of our responsibility to manage our increasing workload. In the year since the adoption of our emergency order, I have seen no decline in the quality of briefing because attorneys are being compelled to shorten their briefs. In fact, I believe that the opposite has been true. Briefs have become less verbose and, because each word and sentence has to count, arguments are more considered and to the point. Moreover, in those rare cases that require briefing in excess of the new page and word limitations, we have accommodated counsel on demonstration of good cause.

As to our internal determination to only consider seven new cases for classification each week, this decision is also fully justified. While this practice was first implemented in conjunction with our June 28, 2000 emergency order, the underlying problem existed for some time. Indeed, the problem would still exist if we had not done something about it. Prior to our initiation of the seven-new-cases-for-classification-per-week rule, the Clerk of Court's office would send up to the Court all new classification cases for which briefing had

14

been completed in that week. Sometimes, the members of the Court might get only three to five new sets of briefs in a week (consisting usually of three, but sometimes more, individual briefs per set). Very often, however, each member of the Court would get substantially more than that--10, 12 or even 15 sets.

Since the panel members assigned to a case have only one week to read the briefs and do whatever additional research and record review each deems necessary before having to vote, the concern was that conference votes were often being made on the basis of a less than thorough review. This problem was exacerbated with each year's steady increase in new filings. Not only have the filings of new cases for classification increased, but new filings of petitions for writs, motions, applications for original proceedings, and lawyer disciplinary proceedings--all of which have to be read and decided by every member of the Court--have also increased substantially in the last few years.

This Court's seven-sets-of-briefs rule was designed to control our weekly reading load of new cases for classification to the end that, as to those cases at least, the panel members could give each case more deliberate and thorough consideration and thus be better prepared to render a more informed and intelligent conference vote. Again, in my opinion, this protocol has worked well.

The suggestion that we have adopted this internal rule for the ulterior purpose of shirking our judicial responsibilities or to engage in a union-type work stoppage is as ridiculous as it is demeaning to the members of this Court. I know of no Justice on this Court

15

who does not take work home at night and on weekends, who does not spend a number of holidays in the office, who does not read briefs while traveling (often on vacations) and who does not work as long, if not longer, hours than before June 28, 2000. Attempting to intelligently manage a crushing workload--which increases every year--in order to maintain the quality of the Court's work product should be commended, not condemned.

Moreover, as to the contention that the seven-sets-of-classification-briefs per week rule has resulted in backlogs and delays, I have several observations. First, it is true that briefs for classification have accumulated in the Clerk of Court's office. Notwithstanding, I do not believe that this has resulted in any delay in our resolution of appeals. The fact is that most members of the Court are already carrying a substantial backlog of unwritten opinions by reason of the sheer numbers of cases that we each consider and are, ultimately, assigned to write. Where the delay in opinion writing is six months or more--as it is now--the fact that a set of briefs sits in the Clerk of Court's office for eight weeks before being sent to the Court delays the ultimate resolution of the case not at all.

Of more concern, to this writer at least, is that there is a substantial delay in getting opinions written. And, that brings me to my second observation. While some members of this Court are concerned about appellate delay--and for that reason urged the creation of an intermediate appellate court to pro-actively address the problem--we were told by members of the Bar that delay was not a big concern. Randy Bishop, a respected and experienced civil trial and appellate lawyer from Billings (and, at the time, President of the Montana Trial

16

Lawyers Association) testified in March of this year before the Legislature in opposition to the creation of an intermediate appellate court. He stated:

> Six to seven months is a long time when you're waiting for an opinion, there is no question about that. But the 18 months my clients wait from the time that a case goes to preliminary pre-trial conference and a jury trial actually occurs is even longer. Delay is part of this system.
> . . . I am not saying that further delay or that extended backlogs in the Supreme Court, appellate level, are a good thing but I am suggesting to this committee that the full blown creation of a permanent judicial intermediate layer of courts is unnecessary.

Unfortunately, Mr. Bishop's comments were fairly typical of those heard by the members of this Court who spent countless hours writing articles and speaking to bar associations and to individual attorneys on behalf of the intermediate appellate court legislation. Delays in the appellate process in this State were, and apparently are, viewed by attorneys as perfectly acceptable, and, when compared to delays in the trial courts and in the federal court system, are considered not worthy of much concern at all.

That is not my view now, nor has it been. I still firmly believe that taking six months or more to write an opinion once a case is submitted after the conference vote is too long. I still believe that litigants are being denied their Article II, Section 16 constitutional rights to meaningful access to the courts and to speedy and efficient justice by this delay. And, I am absolutely convinced that this delay is going to get progressively worse until the Legislature sees fit to create an intermediate court of appeals.

And, that brings me to my final observation. I could not agree more that the matter of creating an intermediate appellate court in the 2001 session of the Legislature ultimately

17

degenerated into a politicized debacle. In fairness, various members of this Court, some members of the Bar, and a few legislators from both sides of the isle, worked tirelessly and cooperatively in an attempt to cause a fair and properly structured court of appeals to be created. The citizen groups we visited were in favor of creating an intermediate appellate court, and the State's major newspapers all gave editorial endorsements to the proposed legislative effort.

Notwithstanding, in the end a worthy and much-needed piece of legislation died in a typical end-of-session peeing match driven by special interest groups and characterized by partisan one-upmanship. In short: politics as usual, 1; litigants, courts, and the people of Montana, 0. Disappointing? Yes. Surprising? No. Deal with it? We will.

In conclusion, I have signed our Order because we are attempting to responsibly manage a staggering amount of work, knowing full well that our situation is going to get a lot worse before it gets any better. We are following the recommendations of the blue-ribbon Study Committee and the Hanson Report. We are attempting to do what the practicing members of the Bar, special interest groups, and legislators have demanded of us and what those same people have criticized us for not doing. And, most importantly, we are attempting to preserve the quality of our work product.

For these reasons, I concur.

Justice

18

Justice W. William Leaphart concurs in the foregoing special concurrence.

_____
                        Justice

19

Justice W. William Leaphart specially concurring:

The dissent contends that the Court is engaged in a "work stoppage." Normally I would not respond to such an absurd proposition. However, since it is unfortunately a public accusation, a reply is appropriate. Furthermore, since the members of the Court have been depicted by the dissent as conniving laggards, my response is somewhat less diplomatic than I would ordinarily consider judicious. But then diplomacy is not the order of the day.

Justice Trieweiler characterizes the weekly brief limit as "arbitrary" and "peevish." As the initial proponent of the weekly brief limit, I can offer a more positive perspective.

A majority of the Court felt that we could not continue to entertain an untold number of briefs in any one week; that the reading demands of the workload (over 3000 pages per month as of 1999) had progressed to the point that we were having to cast our weekly votes based upon a very rushed reading of the briefs and little or no time to review the record or cited authorities. In short, we felt that, in order to do each case justice, we needed to devote more, not less, time reviewing cases before we cast our votes. Given that there are only so many hours in the day and given the ever-increasing number of motions, petitions for writs and lawyer disciplinary matters coming before the Court, we decided it made sense to budget our time so that each set of briefs would be assured a greater period of reading time. Accordingly, in the spring of 2000 we analyzed the Court's workload over the previous three to four years to determine how many cases a week we would have to vote on and still keep abreast of the workload. That number was seven. The problem, of course, is that since that time, the number of cases has continued to increase while the number of hours in the day has

20

not. Not surprisingly, we presently have a backlog of cases in the Clerk of Court's Office. Obviously there is no magic to the number seven. The question is do we continue with our efforts to maintain quality with some sort of weekly limit or throw in the towel and start pumping out votes and decisions at whatever speed the filings demand.

This State is fortunate to have a young and energetic Court. Every member is extremely dedicated and hard working. This Court produces as many if not more written opinions, on a per judge basis, than any other appellate court in the country. It goes without saying however that at some point, the quantity of opinions being issued begins to take a toll on the quality. The more time we have to work on a case, the better job we do. The frustrating truth is that, despite our efforts to manage our time through shorter briefs and the seven case per week limit, we still do not have sufficient "quality time." Due to the significant increase in motions, writs and prisoner petitions we are, again, merely treading water. That is all the more reason to keep the limit, not jettison it.

Needless to say, we each have different work habits. I, for example, start reading briefs at 6:00 a.m. every day of the week, including weekends and vacations. I read briefs late at night and while riding in cars and planes. With the assistance of my very able law clerks, I have, over the last five years averaged 56 opinions per year. Like other members of this Court, my number of yearly opinions is more than twice the national average for an appellate judge. As these figures attest, Justice Trieweiler's suggestion that I and the other members of the Court are engaged in a "work stoppage" is simply vacuous.

21

As Justices we have individual lives, livelihoods and fortunes in our hands. In terms of fulfilling our responsibility to provide quality justice, we should be spending more, not less time on each case. As a litigant before the Court, I would not want my case to be the last in a long string of cases that a justice is reading late at night before the Court's Thursday morning conference, any more than I would want to be a patient scheduled for a late afternoon operation by a surgeon who concedes that, due to the large number of cases, his or her patients are not getting the attention they deserve.

This whole fracas about a weekly brief limit is, in the final analysis, a tempest in a teapot. Even if we abolish the weekly case limit, we will still have just as big a back log. The only difference is whether the back log is at the front end or back end of the process. Under the present system, cases become back-logged waiting to be voted on. Without the weekly limit, the cases get voted on sooner but then pile up waiting for justices to draft opinions. Either way, the cases take the same amount of time to move through the system. The difference is that the weekly limit allows us more time to spend digesting the briefs *before* we vote. The alternative requires that we hastily consider and vote in a week's time and then allow the case to languish on one justice's writing assignment list for months.

The Spartan approach of trying to read all briefs, regardless of number, in a week's time, has no place in a deliberative system of justice. If there is a problem with backlog, the answer lies in more courts or more judges--not in expecting the present justices to "bite the bullet" and rush to judgment.

22

Setting a new standard in collegiality, Justice Trieweiler suggests that those of us who do not accept his case management approach should consider other "job options." As much as I value this advice, the fact is that I am proud to serve as a justice on the Montana Supreme Court. The members of this Court are hard working, dedicated public servants. Like them, I do not in the least begrudge the long hours that I work. Although I am confident that I am doing a good job, I would like the opportunity to do a better job by focusing more time on briefs and opinions than I presently can.

As justices, we are responsible for managing our workload so that we have sufficient time to give each set of briefs a fair reading, an intelligent vote and a considered opinion. The number of filings is increasing each month. In the absence of some effort to manage our workload and budget our time, we will be reduced to black-robed automatons mechanically issuing one line rulings; affirmed or reversed. The public deserves better from its highest court.

I concur.

_W. William Leaphart_
Justice

Chief Justice Karla M. Gray specially concurring:

I join in Justice Nelson's concurring opinion in its entirety. I also join in Justice Leaphart's concurring opinion, writing separately only to say that I organize the substantial numbers of "extra" hours I work each week differently than Justice Leaphart does.

_Karla M. Gray_
Chief Justice

23